UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
═══════════════════════════════════════════════════════════════

SHAUNDEL SMITH and
FRANK SMITH,

                  Plaintiffs,

-v.-                                           5:10CV00352 (NPM/GHL)

THE CITY OF SYRACUSE, DETECTIVE
THOMAS SKARDINSKI, DETECTIVE
SEAN LYNCH, DETECTIVE GEORGE
HACK, SERGEANT EDWARD
TAGLIALATELA, DETECTIVE STEVEN
KILBURN, DETECTIVE EDWARD
MACBLANE, LIEUTENANT CONLEY,
DETECTIVE PATRICK DECASTRO,

                  Defendants.

---------------------------------------------------------------------------------------------------

APPEARANCES:                                    OF COUNSEL:

Law Office of Antoinette L. Williams, P.C.     Antoinette L. Williams, Esq.
Attorney for Plaintiffs
One Wolfs Lane
Pelham, NY 10803

City of Syracuse                         James P. McGinty, Esq.
Office of Corporation Counsel             Michelle K. Venezia, Esq.
Attorney for Defendants
233 East Washington Street
Room 301 City Hall
Syracuse, NY 13202

NEAL P. McCURN, Senior District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiffs Shaundel Smith ("Shaundel") and Frank Smith ("Frank") (collectively, "plaintiffs") bring this action seeking monetary and declaratory relief against the City of Syracuse ("City"), Detective Thomas Skardinski ("Skardinski"), Detective Sean Lynch (Lynch), Detective George Hack ("Hack"), Sergeant Edward Taglialatela ("Taglialatela"), Detective Steven Kilburn ("Kilburn"), Detective Edward MacBlane (MacBlane"), Lieutenant Conley ("Conley"), Detective Patrick DeCastro ("DeCastro"), all individually and in their official capacities, (collectively, "defendants").

Plaintiffs seek redress for alleged violations of their civil rights pursuant to 42 U.S.C.A. § 1983 and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the laws of the State of New York.  Plaintiffs allege, inter alia, that defendants subjected Shaundel to an illegal search of his person and home, an illegal seizure of his person, unlawful arrest, false imprisonment, illegal detention, excessive force, medical neglect, harassment, humiliation and intimidation.  Plaintiffs allege that defendants subjected Frank to an illegal search of his person and home, unlawful arrest, false

2

imprisonment, illegal detention, excessive force, harassment, humiliation and intimidation.  Plaintiffs seek compensatory damages to be assessed against all defendants and punitive damages against the police officer defendants in their individual capacities, together with the costs and disbursements of this action.

The court has jurisdiction over this matter pursuant to 42 U.S.C.A. § 1983 and 42 U.S.C. § 1988 and 28 U.S.C.A. §§ 1331, 1343 and 1367.  Currently before the court is defendants' motion for summary judgment (Doc. No. 29) pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.[1]  For the reasons stated below, the motion for summary judgment is denied in its entirety.

## I.    Facts and Procedural History

The following facts are taken from the plaintiffs' amended complaint and sworn deposition testimony.[2]  Plaintiffs Shaundel and Frank Smith are brothers,

---

[1]    The court notes that the defendants' submission does not conform to the Rule 7.1(a)(1) of the Local Rules of the Northern District of New York, in that it does not include a table of contents or citations to decisions contained within the memorandum of law.  However, for the sake of judicial economy, and to avoid requiring  plaintiffs to respond to an amended version, the court considers the document at hand.

[2]    The court also notes that plaintiffs did not conform to the Local Rules, which state in pertinent part that "the non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertion in matching numbered paragraphs." L.R. 7.1(a)(3).  Accordingly, again for the sake of judicial economy, the court draws the facts from plaintiff's response and from the record, resolving  all ambiguities and drawing all permissible factual inferences in favor of the plaintiffs, the parties against whom summary judgment is sought. See Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).

and at all times relevant to this action, these young African-American males lived together in an apartment in DeWitt, NY.  Frank graduated from Keuka College with a degree in criminal justice and at the time of his deposition was one class short of obtaining a master's degree in criminal justice administration.  At the time of the incident giving rise to this action, Frank was employed as a health service specialist with the Center for Community Alternatives in Syracuse, NY, and was an HIV and AIDS educator in five of the state correctional facilities.  Shaundel pursued a bachelor's degree in fine arts on Long Island, NY.  He states that he completed three years of college, and at the time of deposition, intended to complete his degree.  At all times relevant to this action, Shaundel was employed as a dishwasher at the Renaissance Hotel in Syracuse, NY.  Deposition testimony reveals that neither of these young men had a criminal history.

On November 5, 2008, a young man named Khalic Pitts was shot and killed in the City of Syracuse.  In the course of the subsequent police investigation, a confidential informer told police detectives that plaintiff Shaundel Smith was a witness to the shooting.  Shaundel had attended junior high school with the shooting victim.  Shaundel testifies in his deposition that he had been in the vicinity of the shooting earlier in the evening, and did in fact see Mr. Pitts at a restaurant on Westcott Street.  Shaundel asserts that he had continued on to a

4

friend's house after seeing Pitts, and did not witness the shooting that occurred approximately two hours later, but later heard about the shooting on the television news.

After the Pitts murder, defendants followed up on the information provided by the informant. On November 12, 2008, defendants Skardinski and Lynch were assigned to interview Shaundel. At approximately 6:00 p.m. that evening, Frank had returned home to his apartment in DeWitt, and had fallen asleep when he heard someone knocking at his door. Through the peephole on his door, Frank saw two individuals standing there. They identified themselves as police officers and said they were looking for Shaundel.[3] Frank told them that Shaundel was not at home, and the officers left a business card, with the admonition for Frank to tell Shaundel they needed to talk to him.

Frank went back to sleep and some time later, after Shaundel had returned home from work, was again awakened by police officers banging on the apartment door. Shaundel had worked until midnight, and had returned home at approximately 12:15 a.m. on November 13, 2008. He arrived at the apartment he shared with Frank by walking through a wooded area, after being dropped off by a

---

[3]      Deposition testimony subsequently revealed that the two individuals were detectives Skardinski and Lynch.

5

friend on a road adjoining the street he lived on.   Shaundel was approached from the vicinity of the parking lot by two unidentified men (subsequently identified as defendants Skardinski and Lynch) who shouted that they wanted to speak to Shaundel.  Not knowing the men, Shaundel continued on and entered the apartment.  Once Shaundel entered the apartment, the two defendants allegedly tried to enter the apartment by turning the door knob.  Plaintiffs allege that Skardinski and Lynch insisted that plaintiffs open the door, and continued to pound on the door, attempting to gain entry.  Plaintiffs soon began to hear more defendants outside of the apartment door.  Plaintiffs allege that defendants directed their flashlight beams into a bedroom window, and became increasingly loud, threatening to go get a warrant if plaintiffs did not open the door, and also shouting that they had an arrest warrant for Shaundel.  Plaintiffs allege that the defendants used profanity and threats in an attempt to intimidate the plaintiffs into opening the door.

Plaintiffs allege that defendants requested a key from a maintenance worker who lived upstairs in the same apartment building.  Defendants then attempted to gain entry with the key, but plaintiffs thwarted that attempt by grasping the lock from inside of the apartment.  Plaintiffs allege that the banging on the door and yelling became louder and more disturbing.  The officers allegedly told Frank that

6

he was also going to be arrested for obstructing governmental administration. Upon assurances by the defendants that they only wanted to talk to Shaundel, plaintiffs opened the door. Plaintiffs allege that once the door was opened, the defendants entered the apartment with weapons drawn, and one defendant pushed a gun into Shaundel's side. Plaintiffs allege that they were ordered to the floor where they were handcuffed, while defendants searched the premises, including the kitchen, bathroom, and the bedrooms of both plaintiffs. After the plaintiffs were taken outside, several defendants allegedly remained in the apartment and continued their search, without benefit of a warrant or permission from the plaintiffs.

Frank was taken from his house wearing only a t-shirt and boxer shorts. On the ride to the Syracuse Public Safety Building ("PSB"), Frank asked that the cuffs be loosened as they were too tight. The officers refused, and when they reached the PSB, Frank was taken into a room and handcuffed to a metal bar, where he remained for approximately one hour. At that time, the handcuffs were removed and Frank was taken to another room where he was interrogated for two or three hours and then released without being charged. Prior to his release, Frank alleges that he was made to apologize to the officers for being disrespectful, which he states he did to facilitate his release, and his apology was met with laughter. He

asked for and was given a ride home by the two officers who had transported him to the PSB.

Shaundel was questioned about the Pitts homicide, with the defendants alleging that Shaundel witnessed the homicide. Defendants forced Shaundel to view pictures of his deceased friend. The pictures showed the decedent on the operating table and showed the bullet wounds in the deceased's body. Shaundel asserts that he was shown the photographs continuously, and found them to be shocking, causing him extreme emotional distress.

When Shaundel had not returned home by the morning of November 14, Frank retained an attorney for his brother. Plaintiffs allege that defendants refused to cooperate with Shaundel's attorney and even denied that he was in custody. Shaundel was allegedly denied access to his attorney. When Frank returned home from work on the afternoon of November 14, he learned that Shaundel had been released from the PSB at approximately 12:30 p.m., had met with his attorney, and had then returned to the home the brothers shared.

Shaundel alleges that while he remained in defendants' custody until Friday, November 14, he was denied adequate food, beverage and medication. Shaundel

suffers from vertigo[4] and was prescribed medicine for that ailment.  That medicine was left behind at his home when Shaundel was taken into custody.  In addition, Shaundel alleges that he was confined to an area that was extremely hot and uncomfortable.   In a perceived attempt to pressure Shaundel into signing a statement that he witnessed the homicide of his friend, defendants allegedly threatened Shaundel with arrest, that they would tell the homicide victim's family that Shaundel was involved in the death of the victim, and that defendants would lock Shaundel in the same unit as the suspect who was in custody for the homicide.  After several hours of continuous interrogation with no sleep, and while suffering from vertigo without being given his prescribed medication, coupled with the threats outlined above, Shaundel asserts that he told defendant Hack that he would sign a statement that he witnessed the shooting of Pitts.   Hack allegedly crafted a statement which Shaundel signed, at which point Shaundel was allowed to sleep.  When Shaundel awoke, he immediately recanted his story and advised Hack that he would not testify before a grand jury.

Shaundel was released from custody on November 14, 2009 without being

---

[4]      The symptoms of vertigo set forth by the National Institute of Health are a sensation that you or the room is moving or spinning. The spinning sensation may cause nausea and vomiting in some people.  Other symptoms can include difficulty focusing the eyes, dizziness, hearing loss in one ear, loss of balance, and/or ringing in the ears. See http://www.nlm.nih.gov/medlineplus/ency/article/001432.htm (2012).

charged with any crime.  Defendants allegedly continued to harass Shaundel after his release by going to his place of employment to ask questions, harassing him when they saw him on the street and continuing to intimidate him.

Plaintiffs filed a Notice of Claim with the City within 90 days of the incident.  A 50-h hearing was held, and subsequent to the 50-h hearing, defendants made no offer of payment.  This action followed.  Plaintiffs' amended complaint alleges nine causes of action.  Defendants filed their motion for summary judgment on June 1, 2011.

## II.    Discussion

Currently before the court is the defendants' motion for summary judgment.  Defendants argue that they are entitled to summary judgment on the plaintiffs' §1983 claims because the officers had probable cause to believe that plaintiffs were engaging in the obstruction of governmental administration.  Defendants also argue that the officers are entitled to summary judgment on the basis of qualified immunity.   The City and defendant officers sued in their official capacities also argue that they are entitled to summary judgment on plaintiffs' Monell claim as plaintiffs are unable to point to specific deficiencies in the police officers' training, or to establish that the plaintiffs' alleged injuries were the result of such deficiencies.  Finally, defendants argue that they are entitled to summary judgment

on plaintiffs' claims that defendants failed to provide medical attention because the facts are insufficient to establish that defendants acted with deliberate indifference to Shaundel's serious medical needs.

### A.    42 U.S.C.A. § 1983 Generally

In order to prevail on a claim under  42 U.S.C.A. § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States, and that the violation was committed by a person acting under color of state law.  Section 1983 states in pertinent part that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable....

42 U.S.C.A. § 1983 (West 2012).

In the case at bar, it is undisputed that the defendants were acting under the color of state law.

11

**B.      Motion for Summary Judgment**

A motion for summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552

(1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d

77, 82 (2d Cir. 2004).  "[I]n assessing the record to determine whether there is a

genuine issue as to a material fact, the court is required to resolve all ambiguities

and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought[.]"  See Security Ins., 391 F.3d at 83, citing

Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).

"Only when reasonable minds could not differ as to the import of the evidence is

summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991), citing Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of

material fact falls upon the moving party, once that burden is met, the non-moving

party must "set forth specific facts showing that there is a genuine issue for trial,"

see Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002),

12

(<u>citing</u> Fed. R. Civ. P. 56(c)), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial, <u>see</u> <u>Peck v. Public Serv. Mut. Ins. Co.</u>, 326 F.3d 330, 337 (2d Cir. 2003), <u>cert. denied</u>, 124 S.Ct. 540 (2003).

### C.    Probable Cause

Defendants first posit that the existence of probable cause to arrest the plaintiffs on the basis of obstruction of governmental administration entitles them to summary judgment on the plaintiffs' §1983 claims for false arrest, false imprisonment, and unlawful detention.  Plaintiffs counter that defendants did not have probable cause to arrest Shaundel, so they could not have had probable cause to arrest Frank for obstructing their efforts.

"Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.  The probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Because the standard is fluid and contextual, a court

must examine the totality of the circumstances of a given arrest." <u>U.S. v.</u>

<u>Steppello</u>, --- F.3d ----, 2011 WL 6450795 at *4 (2d. Cir. 2011) (internal citations

and quotation marks omitted).

New York Penal Law § 195.05 states in pertinent part that "[a] person is

guilty of obstructing governmental administration when he intentionally obstructs,

impairs or perverts the administration of law or other governmental function or

prevents or attempts to prevent a public servant from performing an official

function, by means of intimidation, physical force or interference, or by means of

any independently unlawful act ...  Obstructing governmental administration is a

class A misdemeanor." NY Penal § 195.05 (West 2012).   Here, there was no

evidence that the confidential informant, deemed reliable by the defendants, had

alleged that Shaundel had any involvement in the shooting or had committed a

crime, only the allegation that he had possibly witnessed the fatal shooting event.

Also, the facts of the case do not infer that the officers had any intent to arrest

Shaundel, but only wanted to question him in furtherance of the Pitts murder

investigation.

Various deposed defendants have testified that the plaintiffs had the right to

not open their door and to refuse to be interviewed.  The defendants allege that

plaintiffs' refusal to let the defendants [who were unknown to the plaintiffs] into

14

their home, and their refusal to be interviewed [after midnight, with the apartment surrounded by law enforcement] amounted to obstruction of governmental administration. Incredibly, the defendants also argue that inconsistencies in Shaundel's responses given after he was in custody were enough to "establish probable cause to believe that Shaundel was obstructing governmental administration by withholding information relevant to the homicide and gave the [d]efendants sufficient grounds to hold Shaundel for questioning about the murder." Doc. No. 29-1.  These alleged inconsistencies were noted only after Shaundel and Frank had been forcibly removed from their home and taken into custody, yet are being touted as probable cause for the initial act of detaining the plaintiffs. Doc. No. 29-9, pp. 14-15.  Additionally, the defendants argue that although they had probable cause to charge Frank with obstructing governmental administration, the defendants elected not to charge him once it became clear that his behavior had not been an attempt to conceal information about the homicide under investigation.  Accordingly, the court finds that questions of fact remain whether the defendants had probable cause for the physical apprehension and subsequent detention of the defendants, and whether the plaintiffs exhibited the requisite element of "intimidation, physical force or interference, or by means of

any independently unlawful act"[5] for this misdemeanor charge.  The court finds that there remains a genuine issue of material fact that precludes it from granting summary judgment on this issue.

### D.      Deliberate Indifference to a Serious Medical Need

Shaundel brings a claim of deliberate indifference to a serious medical need against the defendants.  Shaundel argues generally that this was a violation of his constitutional rights, leaving the court to determine the appropriate analysis. Defendants argue that they are entitled to summary judgment on the plaintiffs' §1983 excessive force claim because plaintiffs cannot demonstrate the "deliberate indifference to a serious medical need" necessary to establish liability under the Eighth Amendment.

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.'" Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (internal citations omitted).  "In the case of a person being held prior to trial, however, the 'cruel and unusual punishment'

_____

[5]      NY Penal § 195.05 (West 2012).

16

proscription of the Eighth Amendment to the Constitution does not apply, because as a pre-trial detainee [the plaintiff is] not being punished" Id. (internal citations and quotations omitted).  "Instead, a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody." Id.

This court has recently held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes on it a corresponding duty to assume some responsibility for his safety and general well-being." Malay v. City of Syracuse, 2011 WL 4595201 at * 12.  "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g. food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... Due Process Clause." Id. (quoting DeShaney v. Winnebago Cnty. Dept. of Social Servs., 489 U.S. 189, 199 (1989).  Accordingly, the court finds that the instant case is properly analyzed under the Due Process Clause of the Fourteenth Amendment.

17

This court has recently stated that "courts tend to apply the Eighth Amendment standard when deciding a pre-trial detainee's claim for deliberate indifference to a medical need under the Fourteenth Amendment." Dzwonczyk v. Syracuse Police Dept., 710 F.Supp. 2d 248, 268 (N.D.N.Y. 2008).  "Accordingly, in order for a pre-trial detainee to establish a claim for deliberate indifference to a medical need, a plaintiff must allege (1) a deprivation that is 'sufficiently serious,' i.e., a deprivation that presents a 'condition of urgency, one that may produce death, degeneration, or extreme pain,' and (2) reckless indifference, that is, 'defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm.'" Id. (internal citations and quotations omitted).

Defendants argue that "[w]hile uncomfortable, vertigo does not pose a 'substantial risk of serious harm to those it inflicts,'" citing Molina v. New York, 697 F.Supp.2d 276 (N.D.N.Y. 2010).  The defendant's poorly worded statement infers that Molina deals with vertigo, which it does not.  Defendants assertions amount to little more than their opinion as to Shaundel's medical condition.  The court notes that vertigo, like any medical malady, can have various degrees of severity.  For example, a headache can be a minor irritant, or it can be debilitating for some people.  The Mayo Clinic website advises that "[v]ertigo usually results

18

from a problem with the nerves and the structures of the balance mechanism in your inner ear (vestibular system), which sense movement and changes in your head position. Sitting up or moving around may make it worse. Sometimes vertigo is severe enough to cause nausea, vomiting and imbalance."[6]  Shaundel states that he was under a doctor's treatment for vertigo, and while he was in custody, he was not given food or his prescription medication for his illness.  Shaundel states he had just finished work at midnight, shortly before he was taken into custody.  He was interrogated for approximately four hours, and was not given food or water for the first four to five hours while being interrogated.  The room where he was being held did not have a bed, and when Shaundel attempted to sleep, the officers would reenter the room and attempt to interrogate him again.  Shaundel argues that the defendants had no authority to remove him from his residence and take him into custody for two days, and the defendants' aggressive interrogation tactics worsened Shaundel's vertigo condition.

Plaintiffs argue that whether a specific medical condition poses a "substantial risk of harm" is a question of fact.  The court concurs.  The court is not told the particular seriousness of Shaundel's condition, or actions, if any, that

---

[6]    http://www.mayoclinic.com/health/dizziness/DS00435/DSECTION=causes (2012).

Shaundel could have taken to alleviate his symptoms, which were denied to him. Shaundel was last treated for vertigo at a hospital emergency room on October 1, 2008, approximately six weeks before the incident before the court.  He was given medication to ingest when a vertigo attack began.  The record must be developed as to the seriousness of Shaundel's vertigo during the time he was in custody. Accordingly, the court finds that there remains a genuine issue of material fact that precludes it from granting summary judgment on this issue.

### E.    Excessive Force

Defendants next argue that pursuant to the Eight Amendment, plaintiffs' claims of excessive force must fail because the plaintiffs cannot demonstrate the "wantonness" necessary to establish liability under the Eight Amendment. Plaintiff argues that there are genuine issues of material fact as to whether plaintiff can demonstrate wantonness under the Eight Amendment.  The court finds that defendants, and plaintiffs as well, erroneously analyzed this claim under the Eight Amendment.   The Second Circuit is clear that "[Plaintiff's] claim that he was subjected to excessive force as a pretrial detainee would arise under the Fifth Amendment, and not the Eighth Amendment as the district court had found, because as a pretrial detainee he cannot be punished at all. See Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir.2007), rev'd on other grounds, Ashcroft v. Iqbal, --- U.S.

----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2008).  We therefore proceed by analyzing

[plaintiff's] claims under the due process clause of the Fifth Amendment."

Johnston v Maha, 606 F.3d 39, 41 (2d Cir. 2010).  As stated above,  "a person

detained prior to conviction receives protection against mistreatment at the hands

of prison officials under the Due Process Clause of the Fifth Amendment if the

pretrial detainee is held in federal custody, or the Due Process Clause of the

Fourteenth Amendment if held in state custody." Malay v. City of Syracuse, 2011

WL 4595201 at * 12.  Accordingly, defendants' argument fails on the issue of

excessive force, and when argued under the appropriate standard, questions of fact

remain.  The court denies summary judgment on the issue of excessive force.

### F.    Right to Counsel

Defendants argue that since the right to counsel in a criminal proceeding

attaches only upon the filing of criminal charges, the defendants' interaction with

Shaundel never triggered his Sixth Amendment right to counsel.  Plaintiffs argue

that once Shaundel requested an attorney, the defendants' interrogation should

have ceased and Shaundel should either have been released or given the

opportunity to speak with an attorney.

The Sixth Amendment states in pertinent part that "[i]n all criminal

prosecutions, the accused shall enjoy the right to a speedy and public trial ..., and

to be informed of the nature and cause of the accusation; to be confronted with the

witnesses against him; to have compulsory process for obtaining witnesses in his

favor, and to have the Assistance of Counsel for his defence." USCA CONST

Amend. VI (West 2012).  "[T]his Sixth Amendment right only attaches during

critical stages of the criminal proceedings ... in <u>Miranda v. Arizona</u>,[7] the Supreme

Court interpreted the Fifth Amendment privilege against self-incrimination to

provide additional rights to all suspects undergoing custodial interrogation."

<u>Wood v. Ercole</u>, 644 F.3d 83, 86 n.1 (2d Cir. 2011) (internal quotations and

citations omitted).  In <u>Miranda</u>, the Supreme Court stated that "we concern

ourselves primarily with [the] interrogation atmosphere and the evils it can bring

... In each of the cases, the defendant was thrust into an unfamiliar atmosphere and

run through menacing police interrogation procedures. The potentiality for

compulsion is forcefully apparent ... It is obvious that such an interrogation

environment is created for no purpose other than to subjugate the individual to the

will of his examiner. " Id., 384 U.S. at 456, 57.  The <u>Miranda</u> Court ultimately held

that "[a]ccordingly, we hold that an individual held for interrogation must be

clearly informed that he has the right to consult with a lawyer and to have the

_____

[7]        384 U.S. 436, 458 (1966).

lawyer with him during interrogation ... As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation." Id. at 471.

In the defendants' memorandum of law, despite the record as a whole indicating that Shaundel was being sought for questioning only as a possible witness to the Pitts murder, defendants argue that "[d]etectives Lynch and Skardinski went to the [p]laintiffs' residence knowing that a confidential informant had placed Shaundel Smith at the scene of a homicide." Doc. No. 29-1, p. 12.  They also state that "[g]iven their knowledge of *Shaundel's involvement in a murder*, Shaundel's flight and refusal to open the apartment door gave the detectives a reasonable basis on which to conclude that probable cause existed to arrest Shaundel." Id. (*emphasis added*).  Defendants also state, apparently for the first time, that defendants were unable to confirm Frank's identity due to his refusal to open the door, and  "[g]iven Shaundel's apparent connection to the homicide suspect, detectives Lynch and Skardinski had reason to suspect that it was the person responsible for Khalik Pitts' murder that was in the apartment with Shaundel." Doc. No. 29-1, p. 13.  The court contrues this statement to mean that Shaundel, and/or whoever was in the apartment with Shaundel was being sought as a suspect in the Pitts murder, and accordingly, should have been read his

23

Miranda rights before interrogation.  In addition, defendants argue that there was

probable cause to arrest both men on obstructing governmental administration, so

the court construes both men as suspects in that regard, until the defendants

decided to set them free without charges levied against them. There is nothing in

the record indicating that either Frank or Shaundel was notified of his right to

remain silent or right to an attorney, and conversely, the plaintiffs do not argue

that either Frank or Shaundel asked for an attorney.  In addition, the court finds

that questions of fact remain on the issue of whether Shaundel was denied access

to the attorney that Frank subsequently hired for him.  Accordingly, summary

judgment is denied on this issue.

### G.   Qualified Immunity

"Under federal law, a police officer is entitled to qualified immunity where

(1) his conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known, or (2) it was objectively

reasonable for him to believe that his actions were lawful at the time of the

challenged act." Pinter v. City of New York, 2011 WL 5604689 (2d Cir. 2011).

The defendants argue that all of their actions with respect to the plaintiffs' claims

were supported by the necessary probable cause, and therefore constitutionally

permissible.  In regard to defendants Lynch and Skardinski, defendants argue that

they are entitled to summary judgment based on qualified immunity because they had an objectively reasonable basis for believing their actions were constitutional. "Given their knowledge of Shaundel's involvement in a murder, Shaundel's flight and refusal to open the apartment door gave the detectives a reasonable basis on which to conclude that probable cause existed to arrest Shaundel." Doc. No. 29-1, pp. 12-13. Throughout the deposition testimony, the court notes that the officers state Shaundel was interviewed as a potential witness to the murder, not as a suspect or as someone having any involvement in the crime.

Plaintiffs argue that no reasonable person looking at the evidence in the light most favorable to the plaintiffs could objectively conclude that it was reasonable for the defendants to believe they were engaging in lawful conduct and had the authority to do so. Plaintiffs argue that defendants had no authority to order plaintiffs to open their door, no authority to interrogate plaintiffs, no authority to charge plaintiffs with a crime and no authority to detain, arrest and seize the plaintiffs. Because there was no probable cause for arrest for obstruction of government administration, plaintiffs argue that the officers are not entitled to qualified immunity. Plaintiffs proffer that all of the defendants played a role or multiple roles in illegally entering the plaintiffs' residence, illegally searching the plaintiffs and their residence, unlawfully detaining, interrogating and arresting the

25

plaintiffs, depriving Shaundel of medical attention and causing injury to the plaintiffs.

"[D]efendants' claim of qualified immunity cannot be resolved as a matter of law as long as distinct questions of fact persist regarding the motive for the arrest and the existence of probable cause." <u>Zalaski v. City of Hartford</u>, 2011 WL 2040498 (2d. Cir. 2011). Having found, <u>supra</u>, that questions of fact remain surrounding the defendants' claim of probable cause, the court also finds that questions of fact remain on the issue of qualified immunity.

**H.    Municipal and Municipal Employee  Liability**

Finally, defendants argue that municipalities may be held liable under §1983 only when a constitutional deprivation is inflicted pursuant to a government's policy or custom.  Plaintiffs argue that the City failed to train its defendant officers, and cites considerable deposition testimony as evidence thereof.

"To set forth a cognizable claim for municipal liability ..., a plaintiff must plead and prove (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." <u>Rivera v. City of Yonkers</u>, 470 F.Supp.2d 402, 408 (S.D.N.Y. 2007) (quoting <u>Monell v. Dep't of Soc. Servs.</u>, 436

U.S. 658 (1978); <u>Batista v. Rodriguez</u>, 702 F.2d 393 (2d Cir. 1983) (internal

quotations and citations omitted).

> To assert a claim against a municipality pursuant to Section 1983, a
> plaintiff must satisfy the well-settled requirements of <u>Monell v. New
> York City Dept. of Social Servs.</u>, 436 U.S. 658 ... (1978). Under
> <u>Monell</u> and its progeny, a Section 1983 plaintiff must show that a
> violation of his rights by an employee or agent of a municipality was
> the result of a "policy or custom" of the municipality. <u>Id.</u> at 694 ....
> Conclusory allegations of municipal custom or policy are insufficient
> to satisfy this requirement. <u>See</u> <u>Ying Jing Gan v. City of New York</u>,
> 996 F.2d 522, 536 (2d Cir.1993) (the "mere assertion ... that a
> municipality has such a custom or policy is insufficient in the absence
> of allegations of fact tending to support, at least circumstantially,
> such an inference.") (<u>quoting</u> <u>Dwares v. City of New York</u>, 985 F.2d
> 94, 100 (2d Cir.1993)); <u>Cerbelli v. City of New York</u>, 600 F.Supp.2d
> 405, 411 (E.D.N.Y.2009) (holding same). In addition, a municipality's
> failure to train employees to properly protect individuals'
> constitutional rights can also serve as a basis for municipal liability
> under <u>Monell</u>. <u>Jenkins v. City of New York</u>, 478 F.3d 76, 94 (2d
> Cir.2007).

Davis v. Nassau County, 2011 WL 5401663 (E.D.N.Y. 2011).

This court recently held that

> A local government entity's alleged failure to train its employees
> creates liability under § 1983 only "[i]n limited circumstances."
> <u>Connick v. Thompson</u>, —— U.S. ——, ——, 131 S.Ct. 1350, 1359,
> 179 L.Ed.2d 417 (2011). Indeed, a "municipality's culpability for a
> deprivation of rights is at its most tenuous where a claim turns on a
> failure to train." <u>Id.</u> The "stringent standard" of deliberate
> indifference applies to failure-to-train claims. <u>Id.</u> at 1360. In order to
> prevail, the plaintiff must demonstrate that the municipality was "on
> actual or constructive notice that a particular omission in [its] training

program causes ... employees to violate citizens' constitutional rights
[and] the policymakers chose to retain that program." <u>Id</u>. "A pattern
of similar constitutional violations by untrained employees is
'ordinarily necessary' to demonstrate deliberate indifference for
purposes of failure to train." <u>Id</u>.

<u>Malay v. City of Syracuse</u>, 2011 WL 4595201 at * 12 (N.D.N.Y. 2011).

Here, plaintiffs assert that not only has the City failed to train its

subordinates, it has failed to ensure that its subordinates understand the rules and

regulations pertaining to interviewing witnesses.   "At his deposition, Defendant

Kilborn candidly admitted that he was not able to articulate what the rules and

regulations were pertaining to interviewing witnesses as opposed to interviewing

suspects... Defendant MacBlane was not even aware if there was a policy with

respect to interviewing witnesses ... and he never received any training on

interviewing witnesses."  Doc. No. 33, p. 17.  "Defendant Skardinski testified that

in the past eleven years that he 'maybe' had training for custodial arrests on two

occasions.  Defendant Conley testified that the only training received pertaining to

interviewing witnesses was received at the police academy." <u>Id</u>.  Accordingly,

once again the court is precluded from granting summary judgment in favor of the

defendants by remaining questions of material fact.

## III.   Conclusion

For the reasons set forth supra, the court hereby DENIES defendants'

motion for summary judgment (Doc. No. 29) in its entirety.

SO ORDERED.

January 31, 2012


_____
Neal P. McCurn
Senior  U.S. District Judge